UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | UDC Case No. 2:19-CR-2-1 |
| | ) | |
| JAMES ETHAN SHELTON, | ) | |
| | ) | Hon. Rodney Gilstrap |
| Defendant/Movant. | ) | Chief U.S. District Judge |

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR SENTENCE REDUCTION UNDER THE COMPASSIONATE RELEASE STATUTE, 18 U.S.C. § 3582(c)(1)(A)(I), AS AMENDED BY THE FIRST STEP ACT**

COMES NOW JAMES ETHAN SHELTON, Movant *pro se,* in the above styled and numbered cause, and respectfully submits this Memorandum of Law in support of the motion to reduce his sentence under the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act.

I. **Introduction.**

Mr. Shelton seeks a sentence reduction to time served, under the broad authority granted this Court by Section 603 of the First Step Act. *See P.L. 115-391, 132 Stat. 5194, at § 603* (Dec. 21, 2018). This motion should be granted

due to the "extraordinary and compelling reasons" confronting the Federal Bureau of Prisons ("FBOP") as a result of the COVID-19 disaster, which has had and continues to have a pervasive and deadly impact at the Oakdale prison complex, Mr. Shelton's particular medical vulnerabilities if he should be infected with COVID-19, and the salient §3553(a) factors. Unfortunately, the leadership of the Oakdale Federal Prison Complex – of which FCI Oakdale II/Satellite Camp, the prison where Mr. Shelton is currently serving the sentence imposed by this Honorable Court, is a part – appears to have learned nothing from their past mistakes.[1] As of May 12, 2021, the FBOP COVID-19 update shows that inmates or staff at all facilities in the Oakdale Federal Prison Complex are currently infected with COVID-19 and that there have been inmate deaths from COVID-19 at all facilities within the complex.[2] Mr. Shelton's morbid obesity and debilitated medical condition place him at a

---

[1] *See EX #1*, Clare Hymes, *Federal prison didn't isolate inmates who tested positive for coronavirus, report finds*, CBS NEWS (Nov. 17, 2020) available at https://www.cbsnews.com/news/federal-prison-coronavirus-outbreak-fci-oakdale/.

[2] *See EX #2, BOP: COVID-19 Update, pp. 4-5* found at https://www.bop.gov/coronavirus/ (last visited 5/12/2021).

heightened risk of severe illness or death if exposed to COVID-19.

**II.    This Court Enjoys Authority to Reduce Mr. Shelton's Sentence to Time Served to Remove Him from Potential Exposure to COVID-19 and Likely Death as a Result of the COVID-19 Disaster and its Deadly Impact on FPC Oakdale II, Which Constitute Extraordinary and Compelling Reasons under 18 U.S.C. § 3582(c)(1)(A)(I).**

As a result of the changes made in the compassionate release statute by the First Step Act, courts need not await a motion from the Director of the FBOP to resentence prisoners under 18 U.S.C. § 3582(c)(1)(A)(I) based on "extraordinary and compelling reasons," and the reasons that can justify resentencing need not involve only medical, elderly or family circumstances.

**A. Congress's original intent was for district courts to reduce sentences for prisoners on the basis of extraordinary and compelling reasons not limited to medical, family, or elderly circumstances.**

Congress initially enacted the modern form of the compassionate release statute contained in 18 U.S.C. § 3582 as part of the Comprehensive Crime Control Act of 1984. Section 3582(c) states that a district court can modify even a final "term of imprisonment" in four situations, the broadest of which is directly relevant here. A sentencing court can reduce a sentence

if and whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(I). In 1984, Congress conditioned the reduction of sentences on the FBOP Director filing an initial motion in the sentencing court; absent such a motion, sentencing courts had no authority to modify a prisoner's sentence for extraordinary and compelling reasons. *Id.*

Congress never defined what constitutes an "extraordinary and compelling reason" for resentencing under § 3582(c). But the legislative history gives an indication of how Congress thought the statute should be employed by federal courts. One of Congress's initial goals in passing the Comprehensive Crime Control Act was to abolish federal parole and create a "completely restructured guidelines sentencing system." S. Rep No. 98-225, at 52, 53 n.74 (1983). Yet, recognizing that parole historically played a key role in responding to changed circumstances, the Senate Committee stressed how some individual cases may still warrant a second look at resentencing:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe

4

> illness, cases in which other extraordinary and
> compelling circumstances justify a reduction of an
> unusually long sentence, and some cases in which the
> sentencing guidelines for the offense of which the
> defender was convicted have been later amended to
> provide a shorter term of imprisonment.

*Id.* at 55–56 (emphasis added). Rather than having the Parole Commission review every federal sentence focused only on an offender's rehabilitation, Congress decided that § 3582(c) could and would enable courts to decide, in individual cases, if "there is a justification for reducing a term of imprisonment." *Id.* at 56.

Congress intended for the situations listed in § 3582(c) to act as "safety valves for modification of sentences," *id.* at 121, that enabled sentence reductions when justified by various factors that previously could have been addressed through the (now abolished) parole system. This particular safety valve would "assure the availability of specific review and reduction to a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines." *Id.* Noting that this approach would keep "the sentencing power in the judiciary where it

belongs," rather than with a federal parole board, the statute permitted "later review of sentences in particularly compelling situations." *Id.* (emphasis added).

Congress thus intended to give federal sentencing courts an equitable power that would be employed on an individualized basis to correct fundamentally unfair sentences. And there is no indication that Congress limited the safety valve of § 3582(c)(1)(A) to medical or elderly release; if extraordinary and compelling circumstances were present, they could be used to "justify a reduction of an unusually long sentence." S. Rep No. 98-225, at 55–56.

### B. The U.S. Sentencing Commission concluded that § 3582(c)(1)(A)'s "extraordinary and compelling reasons" for compassionate release are not limited to medical, elderly, or family circumstances.

Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the U.S. Sentencing Commission ("Commission"). *See 28 U.S.C. § 994(t)* ("The Commission . . . shall describe what should be considered extraordinary and compelling

reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). Congress provided only one limitation to that delegation of authority: "[r]ehabilitation of the defendant *alone* shall not be considered an extraordinary and compelling reason." *28 U.S.C. § 994(t)* (emphasis added). Congress no doubt limited the ability of rehabilitation alone to constitute extraordinary circumstances so that sentencing courts could not use it as a full and direct substitute for the abolished parole system. Congress, however, contemplated that rehabilitation could be considered with other extraordinary and compelling reasons sufficient to resentence people in individual cases. Indeed, the use of the modifier "alone" signifies just the opposite: that rehabilitation could be used in tandem with other factors to justify a reduction.

The Commission initially neglected its duty, leaving the FBOP to fill the void and create the standards for extraordinary and compelling reasons warranting resentencing under § 3582(c)(1)(A).[3] The Commission finally acted

---

[3] The FBOP promulgated policies governing compassionate release. The latest version prior to passage of the First Step Act was Program Statement 5050.49,

in 2007, promulgating a policy that extraordinary and compelling reasons includes medical conditions, age, family circumstances, and "other reasons." *U.S.S.G. § 1B1.13, application note 1(A).* After a negative DOJ Inspector General report found that the FBOP had rarely moved courts for a § 3582(c)(1)(A) modification even for prisoners who met the objective criteria, *see U.S. Dep't of Justice Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program* (Apr. 2013) ("FBOP Compassionate Release Program"), the Commission amended its policy statement, expanding the guidance to courts on qualifying conditions and admonishing the FBOP to file motions for compassionate release whenever a prisoner was found to meet the objective criteria in U.S.S.G. § 1B1.13. *Id. at application note 4; see also United States v. Dimasi,* 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the progression from the OIG report to new "encouraging" guidelines).

The Commission created several categories of qualifying reasons: (A) "Medical Conditions of the Defendant," including terminal illness and other

---

Compassionate Release/Reduction in Sentences (Mar. 25, 2015).

serious conditions and impairments; (B) "Age of the Defendant," for those 65 and older with serious deterioration related to aging who have completed at least 10 years or 75 percent of the term of imprisonment; (C) "Family Circumstances," where a child's caregiver or spouse dies or becomes incapacitated without an alternative caregiver; and (D) "Other Reasons," when the Director of the FBOP determines there is "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id., application note 1(A)*. The Commission also clarified that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." *U.S.S.G. § 1B1.13, application note 2.* In other words, even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court, [that fact] does not preclude consideration for a [sentence] reduction." *Id.*

Consistent with the text and legislative history of § 3582(c), the Commission concluded that reasons beyond medical, age, and family

circumstances could qualify as "extraordinary or compelling reasons" for resentencing, and that the extraordinary or compelling reasons need not be based on changed circumstances occurring after the initial sentencing of the defendant.

### C. Through the First Step Act, Congress changed the process for compassionate release based on criticism of the FBOP's inadequate use of its authority, returning to the federal judiciary the authority to act on its own to reduce sentences based on "extraordinary and compelling reasons."

Prior to Congress passing the First Step Act, the process for compassionate release under § 3582(c)(1)(A) was as follows: the U.S. Sentencing Commission set the criteria for resentencing relief under § 3582(c), and the only way a sentencing court could reduce a sentence was if the FBOP Director initiated and filed a motion in the sentencing court. *See PL 98–473 (HJRes 648), PL 98–473, 98 Stat 1837* (Oct. 12, 1984). If such a motion was filed, the sentencing court could then decide where "the reduction was justified by 'extraordinary and compelling reasons' and was consistent with applicable policy statements issued by the Sentencing Commission." *Id.* So even if a

federal prisoner qualified under the Commission's definition of extraordinary and compelling reasons, without the FBOP Director filing a motion, the sentencing court had no authority to reduce the sentence, and the prisoner was unable to secure a sentence reduction. This process meant that, practically, the FBOP Director both initiated the process and set the criteria for whatever federal prisoner's circumstances the Director decided to move upon.[4]

Leaving the FBOP Director with ultimate authority for triggering and setting the criteria for sentence reductions under § 3582(c)(1)(A) created several problems. The Office of the Inspector General found that the FBOP failed: to provide adequate guidance to staff on the criteria for compassionate release, to set time lines for reviewing compassionate release requests, to

---

[4] The Department of Justice has recognized that, prior to the passage of the First Step Act, FBOP (and not the Commission) functionally had final say on what constituted an "extraordinary and compelling reason" for a sentence reduction, because only FBOP could bring a motion under the terms of § 3582(c)(1)(A). *See Dep't of Justice, Letter to U.S. Sentencing Commission Chairman Hinojosa* (July 14, 2007) (noting that because Congress gave FBOP the power to control which particular cases will be brought to a court's attention, "it would be senseless [for the Commission] to issue policy statements allowing the court to grant such motions on a broader basis than the responsible agency will seek them").

create formal procedures for informing prisoners about compassionate release, and to generate a system for tracking compassionate release requests. *See FBOP Compassionate Release Program, at i–iv.* As a result of these problems, the OIG concluded that "BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered." *Id.; see generally Stephen R. Sady & Lynn Deffebach, Second Look Resentencing Under 18 U.S.C. § 3582(c) as an Example of Bureau of Prisons Policies That Result in Overincarceration,* 21 FED. SENT. RPTR. 167 (Feb. 2009).

Congress heard those complaints. In late 2018, Congress passed the First Step Act, part of which transformed the process for compassionate release under § 3582(c)(1)(A). *See P.L. 115-391, 132 Stat. 5194, at § 603* (Dec. 21, 2018). Section 603 of the First Step Act changed the process by which § 3582(c)(1)(A) compassionate release occurs: instead of depending upon the FBOP Director to determine an extraordinary circumstance and then move for release, a court can now resentence "upon motion of the defendant," if the defendant has

fully exhausted all administrative remedies, "or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *18 U.S.C. § 3582(c)(1)(A).* Once the defendant who has properly exhausted files a motion, a court may, after considering the 18 U.S.C. § 3553(a) factors, resentence a defendant, if the court finds that extraordinary and compelling reasons warrant a reduction. *Id.* Any reduction of a sentence that a court orders must also be "consistent with applicable policy statements issued by the Sentencing Commission." *Id.* The effect of these new changes is to allow federal judges the ability to move on a prisoner's compassionate release application even in the face of FBOP opposition or its failure to respond to a prisoner's request for compassionate release in a timely manner.

Congress made these changes in an effort to expand the use of compassionate release sentence reductions under § 3582(c)(1)(A). Congress labeled these changes, "*Increasing* the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018) (emphasis added). Senator Cardin noted in the record that the First Step Act made

several reforms to the federal prison system, including that"[t]he bill *expands compassionate release* under the Second Chance Act *and expedites compassionate release applications.*" 164 Cong. R. 199, at S7774 (Dec. 18, 2018) (emphasis added). In the House, Representative Nadler noted that First Step included "a number of very positive changes, such as . . . *improving application of compassionate release,* and providing other measures to improve the welfare of Federal inmates."164 Cong. Rec. H10346-04, 164 Cong. Rec. H10346-04, H10362 (Dec. 20, 2018) (emphasis added).

Federal judges now have the power to order reductions of sentences even in the face of FBOP resistance or delay in the processing of applications. The legislative history leading up to the enactment of the First Step Act establishes that Congress intended the judiciary not only to take on the role that FBOP once held under the pre-First Step Act compassionate release statute as the essential adjudicator of compassionate release requests, but also to grant sentence reductions on the full array of grounds reasonably encompassed by the "extraordinary and compelling" standard set forth in the

applicable statute.

**D. Statutory text defines judicial sentence reduction authority around "extraordinary and compelling reasons," and the policy statements of the U.S. Sentencing Commission under § 1B1.13 do not preclude this Court from resentencing Mr. Shelton.**

Once a prisoner has properly pursued administrative remedies and filed a motion for compassionate release, a federal court possesses authority to reduce a sentence if and whenever the court finds "extraordinary and compelling reasons warrant such a reduction." A court must consider the 18 U.S.C. § 3553(a) sentencing factors in reducing any sentence, and any reduction of a sentence that a court orders must also be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). However, due to the Sentencing Commission's failure to amend its policy statement on compassionate release following the enactment of the First Step Act, there does not appear to be a policy statement, "applicable" to these circumstances.[5]

---

[5] *See United States v. Shkambi*, 993 F.3d 388, _____, 2021 WL 1291609, at *4 (5th Cir. 2021) (Wherein the Fifth Circuit addressed whether the policy statement to § 1B1.13, which applies to "motion[s] of the Director of the Bureau of Prisons," was also an "applicable policy statement[ ]" for motions filed by prisoners *Id.* at ——, at *4. The

As noted above, the Sentencing Commission created a catch-all provision for compassionate release under U.S.S.G. § 1B1.13, application note (1)(D), which states:

> Other Reasons. — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

The Commission also stated the process by which compassionate release reductions should be decided:

Court held that it was not. *Id.* Consequently, because § 1B1.13 is not an "applicable policy statement" to compassionate release motions filed by prisoners, "neither the policy statement nor the commentary to it binds a district court addressing a prisoner's own motion under § 3582." *Id.*). In so ruling the Fifth Circuit joined numerous other Courts of Appeals which have similarly held that there is no currently applicable policy statement for motions for compassionate release tendered by prisoners. *See United States v. McCoy*, 981 F.3d 271, 281 (4th Cir. 2020) ("What § 3582(c)(1)(A) requires is that sentence reductions be consistent with "applicable policy statements." And here, that consistency requirement simply is not implicated, for the threshold reason that there currently exists no "applicable policy statement[ ]." In so holding, we join three federal courts of appeals that recently have considered this question. *See [United States v.] Zullo*, 976 F.3d [228] at 230; *United States v. Jones*, 980 F.3d 1098, No. 20-3701 (6th Cir. Nov. 20, 2020); *United States v. Gunn*, 980 F.3d 1178, No. 20-1959 (7th Cir. Nov. 20, 2020)."); *see also, United States v. McGee*, 992 F.3d 1035, 1047, No. 20-5047 (10th Cir. 2021) (finding the Fourth Circuit's analysis persuasive and holding that district court's considering compassionate release motions are free to make there own determinations as to what may constitute "extraordinary and compelling circumstances).

> Motion by the Director of the Bureau of Prisons.—A reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons pursuant to 18 U.S.C. § 3582(c)(1)(A).

*U.S.S.G. § 1B1.13, application note 4.*

The dependence on FBOP in these policy statements is a relic of the prior procedure that is now inconsistent with the First Step Act's amendment of § 3582(c)(1)(A). Application note 1(D) can no longer limit judicial authority to cases with an initial determination by the FBOP Director that a prisoner's case presents extraordinary or compelling reasons for a reduction, because the First Step Act expressly allows courts to consider and grant sentence reductions even in the face of an adverse or unresolved FBOP determination concerning whether a prisoner's case is extraordinary or compelling. *See 18 U.S.C. § 3582(c)(1)(A), as amended by P.L. 115-391 § 503* (Dec. 21, 2018). And the Commission's now-dated statement indicating that the FBOP must file a motion in order for a court to consider a compassionate release sentence reduction no longer controls in the face of the new statutory text enacted explicitly to allow a court to consider a reduction even in the absence of a

FBOP motion. *Id.* With the First Step Act, Congress decided that federal judges are no longer constrained or controlled by how the FBOP Director sets its criteria for what constitutes extraordinary and compelling reasons for a sentence reduction. Consequently, those sections of the application notes requiring a FBOP determination or motion are not binding on courts. *See Stinson v. United States*, 508 U.S. 36, 38 (1993) ("We decide that commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."). Put differently, now that the First Step Act has recast the procedural requirements for a sentence reduction, even if a court finds there exists an extraordinary and compelling reason for a sentence reduction without the FBOP Director's initial determination, then the sentence reduction is not inconsistent "with the applicable policy statements issued by the Sentencing Commission." *18 U.S.C. § 3582(c)(1)(A).*

## III. Mr. Shelton Presents Extraordinary and Compelling Reasons Why His Sentence Should be Reduced.

Mr. Shelton has exhausted administrative remedies under the compassionate release provision and presents this Court with extraordinary and compelling reasons for reducing his sentence.

### A. A Request for Mr. Shelton's Compassionate Release under the First Step Act was Submitted to the Warden of FCI Oakdale II.

Mr. Shelton has exhausted his administrative remedies under the First Step Act ("FSA"). On April 21, 2021, Mr. Shelton submitted an inmate request to staff form seeking compassionate release to the Warden of FPC Oakdale, by handing the same to his counselor, Mrs. Kadrovich, at 8:10AM that day.[6] As more than 30 days have passed since Mr. Shelton submitted his request for compassionate release to the Warden of FPC Oakdale, his request for compassionate release is ripe for consideration by this Honorable Court. *See United States v. Franco*, 973 F.3d 465, 467 (5th Cir. 2020) ("In the words of the statute, courts may hear requests upon motion of the defendant after the

---

[6] *See EX #3, Inmate Request to Staff Form from James Ethan Shelton to the Warden of FCI Oakdale II,* dated 4/21/2021.

defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier.... *Id.* The text therefore outlines two routes a defendant's motion can follow to be properly before the court.").

### B. The COVID-19 disaster combined with Mr. Shelton's debilitated medical condition present extraordinary and compelling reasons justifying a sentence reduction.

COVID-19 is extremely contagious in close quarters such as prisons,[7] and is hospitalizing and killing prisoners like Mr. Shelton at a high rate. Mr. Shelton's medical condition indicates an increased risk of severe illness and death should he be infected with COVID-19. Mr. Shelton is particularly medically vulnerable because he is morbidly obese and has suffered at least three recent seizures – for which he has received no treatment.

Mr. Shelton, who stands 5' 10" and weighs 332 lbs, has a body mass

---

[7] *See EX #4, Letter from Carlos Franco-Paredes, MD, MPH, Director, Infectious Diseases Fellowship, University of Colorado,* dated March 22, 2020, pp. 2-3; *EX #5, Affidavit of Danielle C. Ompad, PhD, regarding SARS-CoV-2 infection (otherwise known as COVID-19) in correctional settings,* signed March 20, 2020, No. 6.

index ("BMI") of 47.6.[8] The Centers for Disease Control and Prevention ("CDC") recognize that the severely obese – which they define as individuals with a BMI of 40 or more – are "at increased risk for severe illness [] from COVID-19."[9] Courts have granted obese prisoners compassionate release based on their increased medical vulnerability to severe illness or death if infected with COVID-19.[10]

Mr. Shelton's health is further compromised by virtue of the realities that he: 1) suffered a severe head trauma in 2009; 2) has a plate and 8 screws in the left side of his face; 3) is afflicted with severe back pain and numbness in his extremities, arising from a compression fracture to his spine in 2008;

---

[8] *See EX #6, BMI Calculator U.S. Dep't of Health & Human Services, National Institute of Health, Standard BMI Calculator printout, available at https://www.nhlbi.nih.gov/ health/educational/lose_wt/BMI/bmicalc.htm (last visited 5/12/2021).*

[9] *See EX #7, Coronavirus Disease 2019 (COVID-19): People who are at higher risk for severe illness,* CDC (updated Feb. 22, 2021).

[10] *See e.g., United States v. Smith,* 2020 WL 4345327, at *1 (W.D. Wash. July 29, 2020) (granting compassionate release from 51-month sentence which Smith began serving in January 2020 based, in part, on obesity); *United States v. Chopra,* 2020 WL 4333507 at *1 (S.D. Fla. July 24, 2020) (granting compassionate release from 48-month sentence imposed in February 2020 to 54-year-old prisoner suffering from, amongst other conditions, obesity).

and 4) has fallen victim to three seizures since October of 2020. Despite the apparent seriousness of these seizures, Mr. Shelton has received scant treatment from the FBOP - they did inform him that he was being referred to a neurologist and for a CT scan in late October 2020, but he has yet to be seen by a neurologist and has not received a CT scan.[11]

A review of Mr. Shelton's medical records[12] will demonstrate that he suffers from numerous underlying medical conditions which make him particularly medically vulnerable to severe illness or death is exposed to COVID-19. The CDC cautions that "[t]he more underlying medical conditions someone has, the greater the risk is for severe illness from COVID-19."[13] The CDC defines "severe illness from COVID-19 [] as hospitalization,

---

[11] *See EX #8, Current prescription medications provided to Mr. Shelton by the FBOP.*

[12] Mr. Shelton has requested a copy of his FBOP medical records and will provide the same to this court as soon as they are provided to him. In the alternative, he would gladly waive his medical privacy rights to the extent necessary to allow this court or the United States to obtain his FBOP medical file for the express and limited purpose of considering his motion for compassionate release.

[13] *See EX #7, p. 11.*

admission to the ICU, intubation or mechanical ventilation, or death."[14]

The confluence of Mr. Shelton's particular vulnerability to severe illness or death if exposed to COVID-19 and the COVID-19 disaster, which has already arrived at the Oakdale Federal Prison Complex with lethal impact, present "extraordinary and compelling reasons" to grant his motion for compassionate release. As explained below, FCI Oakdale II houses 940 inmates total – with 106 of those inmates assigned to the satellite camp –[15] and the conditions there make it impossible for Mr. Shelton to practice social distancing or other prophylactic measures to limit his future risk of infection.

Prisons like FPC Oakdale II are dangerous places during an outbreak:

> In America's jails and prisons, people share bathrooms, laundry and eating areas. The toilets in their cells rarely have lids. The toilet tank doubles as the sink for hand washing, tooth brushing and other hygiene. People bunked in the same cell — often as many as four — share these toilets and sinks. Meanwhile, hand sanitizer is not allowed in most prisons because of its alcohol content. Air circulation

---

[14] *See EX #7, p. 1.*

[15] *See EX #9, FBOP: FCI Oakdale II location information,* found at https://www.bop.gov/ locations/institutions/oad/ (last visited 5/12/2021).

is nearly always poor. Windows rarely open; soap may only be available if you can pay for it from the commissary.[16]

Experts recognize the extreme risk of rampant transmission of COVID-19 in correctional settings.[17] Indeed, these realities are likely responsible for the rapid spread of COVID-19 throughout the Oakdale Federal Prison Complex which we witnessed during the previous waves of the pandemic and which lead to mass infections and the death of many prisoners. Impending conditions at FPC Oakdale II are likely to be as bad as the second wave at Butner, where 25 inmates at that prison complex lost their lives to COVID-19 and the FBOP's woefully inadequate mitigation measures and [non]treatment protocols.

Mr. Shelton is powerless to take preventative self-care measures directed by the CDC for his high-risk group to remain safe from COVID-19 infection. These realities and the current wave of the COVID-19 disaster

---

[16] *See EX #10,* Amanda Klonsky, *Opinion: An Epicenter of the Pandemic Will be Jails and Prisons, If Inaction Continues, THE NEW YORK TIMES (March 16, 2020).*

[17] *See EX #4, pp. 2-3; EX #5.*

constitute "compelling and extraordinary reasons" militating for his immediate release. There is an urgent need to act now, before Mr. Shelton is a fatality of COVID-19, upon looming imminent infection.

**C. The § 3553(a) factors support the requested reduction in sentence.**

The compassionate release statute provides that, before reducing a defendant's sentence for "extraordinary and compelling reasons," the court must consider the factors set forth in 18 U.S.C. § 3553(a) "to the extent they are applicable." *See 18 U.S.C. § 3582(c)(1)(A).* These factors, including: (1) Mr. Shelton's personal history and characteristics; (2) his sentence relative to the nature and seriousness of his offense; (3) the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public; (4) the need for rehabilitative services; (5) the applicable guideline sentence; and (6) the need to avoid unwarranted sentencing disparities among similarly-situated defendants, militate for reduction of Mr. Shelton's sentence to time served. *See, e.g., United States v. Redd,* 444 F. Supp. 3d 717, 727 (E.D. Va. 2020) (citing 18 U.S.C. §

3553(a)(1)–(6)).

Mr. Shelton has demonstrated positive post-offense and post-sentencing conduct, which "provides the most up-to-date picture of [his] 'history and characteristics.'" *See Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)). Mr. Shelton provided substantial assistance to the United States, a reality which this Honorable Court recognized in granting their Rule 35 motion and reducing his sentence from 120 months' imprisonment to 102 months' imprisonment on April 27, 2020.[18]

While incarcerated, Mr. Shelton has participated in educational, drug treatment and rehabilitative programming.[19] Noteworthy among his accomplishments are completion of drug education class and the national parenting program. Additionally, Mr. Shelton is currently participating in the FBOP's Non-Residential Drug Abuse Program while maintaining his prison work assignments. *Id.*

Mr. Shelton has also maintained clear conduct throughout his time in

---

[18] *See DE #117, Order Reducing Sentence Pursuant to Fed. R. Crim. P. 35(b).*

[19] *See EX #11, FBOP Individualized Reentry Plan-Program Review, dated 4/27/2021, pp. 1-2.*

custody.[20] He has established a good rapport with staff, who score his "living skills" as "good."[21] Since his sentencing, Mr. Shelton has acted to begin the process of retiring the $100 special assessment for his count of conviction through the FBOP's inmate financial responsibility program.[22]

The FBOP has recognized the reality that Mr. Shelton present no danger to the public. Prison official note that he has no record of violence.[23] The FBOP recognized the reality that the public did not require protection from Mr. Shelton, by designating him to serve his sentence at a federal prison camp, which lacks the hard physical barriers – fences, walls, etc. – of other federal facilities, and are reserved for the most harmless of FBOP prisoners, such as Mr. Shelton.

Mr. Shelton presents a strong release plan. Assuming U.S. Probation finds this arrangement agreeable, Mr. Shelton would live with his sister, Billie

---

[20] *See EX #12, Male Custody Classification Form, dated 4/27/2021,* ("TYPE DISCIP RPT.: NONE" "FREQ DISCIP RPT.: NONE"); *EX #11, p. 1.*

[21] *See EX #12* ("LIVING SKILLS.:GOOD").

[22] *See EX # 11, p. 2.*

[23] *See EX #12* ("VIOLENCE.:NONE").

Jo Taravella, at 2005 West Houston, in Marshall, Texas. This constitutes Mr. Shelton's release plan should this Court reduce his sentence to time served.

In conclusion, combined with the COVID-19 disaster, Mr. Shelton's current debilitated medical condition present reasons for this Honorable Court to conclude that his current personal history and characteristics favor the reduction in sentence sought herein. Moreover, Mr. Shelton's post-offense conduct and positive offender characteristics indicate that his earlier release would pose no danger to any person, the community, or that he would engage in future criminal activity. The requested relief is therefore consistent with the policy of the Sentencing Commission, should this Court be of the opinion that such policy is applicable.

Indeed, the only § 3553(a) factors which might give pause to the Court – deference to the seriousness of the offense conduct and due respect for the law – are largely overcome by (1) the unreasonable threat of death in Mr. Shelton's current conditions of confinement and (2) the fact that there are conditions of supervised release which can still provide a "sufficient but not

great than necessary" sanction of punishment. *18 U.S.C. § 3553(a).*[24]

Mr. Shelton's offense conduct was serious, but the circumstances have changed and the government cannot dispute the serious physical danger created by the current pandemic to someone like Mr. Shelton. Nor can the government provide any sense of confidence that the FBOP has the ability to contain the virus and prevent widespread infection, particularly given the similarity of the current circumstances at the Oakdale complex to those which allowed previous waves of the pandemic to spread like a deadly wildfire through the vulnerable prisoner population at that facility.[25]

Mr. Shelton respectfully suggests that his release to supervised release under the current extraordinary and compelling circumstances would not

---

[24] *See, e.g., United States v. Zukerman,* 2020 WL 1650406, at *5 (S.D.N.Y. Apr. 3, 2020) (granting compassionate release to defendant convicted in multi-million-dollar fraud scheme, based on age, hypertension and obesity and explaining "[t]he severity of Zukerman's conduct remains unchanged. What has changed, however, is the environment where Zukerman is serving his sentence. When the Court sentenced Zukerman, the Court did not intend for that sentence to 'include a great and unforeseen risk of severe illness or death' brought on by a global pandemic.").

[25] *See EX #13,* Kimberly Kindy, *Inside the deadliest federal prison, the seeping coronavirus creates fear and danger,* THE WASHINGTON POST (Apr. 10, 2020) ("As the coronavirus pandemic seeps into the 122-facility federal prison system, the Oakdale prison has become the deadliest.").

diminish the seriousness of his offense, but would fulfill Congress's intent in offering courts greater flexibility to adjust and even reduce sentences when changed circumstances justify a later review. Mr. Shelton's debilitated medical condition and the rapidly advancing COVID-19 disaster, together with the prison's inability to permit the self-care measures directed by the CDC to remain safe during the outbreak, warrant the relief sought. Mr. Shelton understands that this request is unusual. But now, more than ever, we need the courts to take action to protect the lives and rights of citizens. Should this court grant this motion, it will not be alone. *See e.g., United States v. Hayes*, No. 09 CR 1032, 2020 WL 3790615, at *3 (N.D. Ill. July 7, 2020) (Explaining the decision to grant compassionate release to prisoner serving 252-month sentence of imprisonment – which he began to serve in 2013 – at the Oakdale complex as follows: "Although Hayes fortunately tested negative for COVID-19 on May 14, 2020, the disease remains highly transmissible in tight spaces like Oakdale. And, despite the BOP's efforts, Oakdale is more than twenty times worse at containing COVID-19 than the rest of nation, and its

inmates are twice as likely to die of COVID-19 than members of the population at large. Hayes remains at extraordinary risk.").[26]

## IV. Conclusion

This Honorable Court should modify Mr. Shelton's sentence to time served to save him from a significant likelihood of death due to imminent COVID-19 infection resulting from the COVID-19 disaster and its pervasive spread throughout the Oakdale prison complex.

---

[26] *See EX #14, Courts Granting Compassionate Release in Light of COVID-19.*

## V. Verification

I, James Ethan Shelton, verify under penalty of perjury, pursuant to 28 U.S.C. §1746 that the foregoing is true and correct. Executed this _16_ day of May, 2021.

James Ethan Shelton, *Pro Se*
Register # 28334-078
FCI Oakdale II – Satellite Camp
P.O. Box 5010
Oakdale, LA 71463

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing

Memorandum Brief in Support of Motion for Sentence Reduction Under the

Compassionate Release Statute has been mailed, first class postage prepaid,

on this __18__ day of May, 2021, to: Assistant United States Attorney, D. Ryan

Locker, Office of the United States Attorney, 110 N College Ave # 700, Tyler,

TX 75702.

Executed under penalty of perjury pursuant to 28 U.S.C. §1746, on this

__18__ th day of May, 2021.

James Ethan Shelton, *Pro Se*
Register # 28334-078
FCI Oakdale II – Satellite Camp
P.O. Box 5010
Oakdale, LA 71463